IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

LUCY E. SANDERS,
        Plaintiff,

v.                                              Case No. 5:12cv136/CJK

MICHAEL J. ASTRUE,
Commissioner of Social Security,
        Defendant.

---

## MEMORANDUM ORDER

This case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying plaintiff Lucy Sanders' application for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83. Plaintiff will be referred to by name, as claimant, or as plaintiff. The parties have consented to Magistrate Judge jurisdiction, pursuant to 28 U.S.C. § 636(c), and FEDERAL RULE OF CIVIL PROCEDURE 73, for all proceedings in this case, including entry of final judgment. (Doc. 8). Upon review of the record before this court, I conclude that the findings of fact and determinations of the Administrative Law Judge (ALJ) are supported by substantial evidence, and that the ALJ correctly applied the law. The decision of the Commissioner, therefore, will be affirmed.

<u>STANDARD OF REVIEW</u>

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied by the ALJ. *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said, "'Substantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (*quoting Lewis*, 125 F.3d at1439). Although the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support." *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). The reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). Nevertheless, a reviewing court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). In sum, review is deferential to a point, but the reviewing

court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273, 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[1]  The recitation of medical and historical facts of this case, as set out below, is based upon my independent review.

The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do her previous work, "but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  *Id.* § 1382c(a)(3)(B).

Pursuant to 20 C.F.R. § 416.920(a)-(g), the Commissioner analyzes a supplemental security income disability claim in five steps:

1.    If the claimant is performing substantial gainful activity, he is not disabled.

2.    If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

---

[1] The Eleventh Circuit speaks not only of independent review of the administrative record, but reminds us it conducts de novo review of the district court's decision on whether substantial evidence supports the ALJ's decision.  *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

3.     If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.     Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity (RFC) and vocational factors, he is not disabled.

Claimant bears the burden at step two of establishing a severe impairment that keeps him from performing his past work. Where this burden has been established, but the impairment does not qualify as a listed impairment, the inquiry must move to step five (or step four in cases where the ALJ decides a claimant can perform his past work). This inquiry often is where the rubber meets the road. At that point, the ALJ formulates the all-important residual functional capacity. Even where one or more severe impairments are established, the claimant must show that he cannot perform work within that residual functional capacity. The ALJ establishes residual functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain). Residual functional capacity is then used by the ALJ to make

the ultimate vocational determination required by steps four and five.[2] "[R]esidual functional capacity is the most [claimant] can still do despite [claimant's] limitations."[3]  20 CFR § 416.945(a)(1).  Often the medical evidence and other evidence of alleged disability are subject to a degree of conflict, and that conflict may lead, as in this case, to an adverse determination.

## FINDINGS OF THE ALJ

The decision of the Administrative Law Judge (ALJ), affirmed by the Appeals Council, determined that plaintiff is not eligible for benefits.  T. 7-21.[4]  The ALJ

---

[2] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.)  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."  20 C.F.R. § 404.920(a)(4).

[3] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

> (3) Evidence we use to assess your residual functional capacity.  We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.  (See § 416.912(c).)  However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.  (See §§ 416.912(d) through (e).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 416.913.)  We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.  (See paragraph (e) of this section and § 416.929.)[.]

20 C.F.R. § 416.945(a)(3).

[4] The administrative record, as filed by the Commissioner, consists of eight volumes, (doc. 7-2 through 7-8), and has 313 consecutively numbered pages.  References to the record will be by "T." for transcript, followed by the page number.

acknowledged claimant has severe impairments–bipolar disorder and schizoaffective disorder. T. 13. Nevertheless, the ALJ assigned a residual functional capacity of a full range of work at all exertional levels, with certain limitations. T. 14. Because claimant could not perform the full range of work, a vocational expert provided opinion evidence as to the step five determination. Based upon such testimony, the ALJ found that claimant could perform work that existed in significant numbers in the national and state economy. This finding led to a conclusion that plaintiff is not disabled.

<u>FACT BACKGROUND AND MEDICAL HISTORY</u>[5]

In her application for SSI, plaintiff claimed a disability onset date of July 1, 2002. T. 104. The relevant medical evidence of record, that being documentation of mental and emotional illness, begins with April of 2005,[6] when claimant admitted herself to the Apalachee Center in Tallahassee.

At the time of admission, Ms. Sanders reported confusion and paranoia. T. 206. An evaluation on April 22, 2005, indicated, "Pt. Is psychotic, delusional probably hallucinating–DRUG induced (??)." T. 203. She tested positive for cannabanoids, and reported a history of using marijuana and crack cocaine. T. 203. The chart shows slow improvement, but also one incident of paranoia, signified by

---

[5] Although intended to be thorough, and to provide an overview of claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as called for in the Analysis section.

[6] The record contains an entry for mental health screening dated June 6, 1996. T. 256. The parties do not attach significance to this record, although it appears claimant received a supply of medication at that time and had a provisional diagnosis to rule out psychotic disorder not otherwise specified. T. 257. Plaintiff at that time reported alcohol use since age 13 and marijuana use since age 13, with usage at 3 joints daily. T. 256.

claimant's belief that "someone is trying to kill me," and a claim that her in-laws put something in her drink. T. 204-06. Chart entries the week of discharge indicate slow improvement, "alert," "affect brighter," and "depression in better control." T. 204. She exhibited no evidence of paranoid ideation upon discharge on May 9. T. 204. According to the discharge summary, she was "appropriate, cheerful affect and upbeat mood." T. 206. The facility provided a discharge diagnosis of major depression with psychosis. T. 206. Claimant was provided with Cymbalta (antidepressant) and Zyprexa (antipsychotic). T. 206. She was advised to report to Wakulla County Unit for follow-up, and to AA for group substance abuse treatment. T. 206.

Plaintiff reported weight gain in May of 2006, the next documented date of treatment. Apalachee Center advised she discontinue Abilify and switched her to Lexapro (antidepressant). T. 253. She was next seen on August 8, 2006, and received a prescription for Seroquel, an antipsychotic. T. 253. The chart for that date does not amplify the context. Claimant missed her next appointment two weeks later. T. 252.

In October 2006, claimant again was taken to the Apalachee Center, on referral from Tallahassee Memorial Hospital. T. 210. The admission was initiated by the Wakulla County Sheriff's Office, which reported Ms. Sanders had a shotgun and was screaming at neighborhood children. T. 216-217. She denied current suicidal ideation. T. 212, 217. Apalachee Center charted "homicidal ideations" upon admission, but nothing in the remaining chart speaks further to this. T. 215. The nursing assessment shows claimant's report of recent marijuana use. T. 209. The admission plan included evaluation and stabilization. T. 218. As reflected on the sheriff's incident report, claimant had not been taking her medication. T. 219, 223.

A mental status exam upon admission indicated schizoaffective disorder, with Global Assessment Functioning (GAF) of 45.[7]   T. 224.   The record does not reflect a discharge summary.

On a follow-up on November 12, however, claimant was back on her medications, had no hallucinations or suicidal ideation, and felt the meds were helping.  T. 252.  Then, in February 2007, claimant confirmed that she had stopped taking her medication before the October admission.  She was now doing well, with no medication side effects.  T. 251.  Upon further follow-up in April 2007 plaintiff reported, "[t]he medication is working for her."  T. 251.  She was alert and oriented in three spheres.  T. 251.   Again, in July 2007, claimant appeared alert and oriented. She reported no ideations.  T. 250.  In August she came back smiling and "feeling good."  She had been sleeping well.  She again appeared alert and oriented.  T. 250. By September, some eleven months after the October 2006 incident, plaintiff was

---

[7] As explained by an Oklahoma District Court:

A GAF represents Axis V of the Multiaxial Assessment system.  A GAF score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders (DSM–IV)*, (4th ed.1994), p. 30.  The GAF score is taken from the GAF scale which "is to be rated with respect only to psychological, social, and occupational functioning."  *Id*.  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  *Id.* at 32.  The GAF scale defines the range from 41 to 50 as follows:  Serious symptoms OR serious impairment in one of the following:  social, occupational, or school functioning.

*Sanders v. Astrue*, No. CIV–10–616–L, 2011 WL 3207367, at *3 n.1 (W.D. Okla. June 30, 2011).

doing well and looked "tanned." She had no thought disorder, and was alert and oriented. T. 249. Her mood was "euthymic."[8] T. 249.

The most recent entries from the Apalachee Center show treatment from February 2008 until November 2009. T. 300-313. In February, March, and April claimant was doing "really well." T. 313. She was cooperative, had good eye contact, and demonstrated appropriate thought process and content. Again, she was euthymic. T. 313. Primary diagnosis reflects schizoaffective disorder. T. 310-13. In May, claimant reported she was getting depressed. This coincided with a switch from Effexor, an antidepressant, to Wellbutrin, another antidepressant. T. 309. She was nevertheless alert and oriented. T. 309.

At an August 2008 visit, the chart reflects a primary diagnosis of "bipolar disorder." Claimant had been doing well with Wellbutrin and Thorazine, an antipsychotic medication. T. 308. For October 2008 the chart reflects patient doing "very well." T. 307. In January 2009 she was stable and doing well. T. 306. The entry for this visit shows a GAF of 80. In March 2009 claimant reported having had some post-Christmas depression, but was over it. She was doing well. T. 305. As with all preceding visits her thought process and content was appropriate, and her mood euthymic. T. 305. In August, claimant was doing well and in good spirits after discontinuing Thorazine. T. 302. By October, she was doing well with the medications, and complained only of weight gain. T. 301. The ARNP discussed diet and exercise. T. 301. The medications had no side effects other than weight gain, and claimant again appeared in good spirits. T. 301. The last entry, November 6,

---

[8] Euthymia is a "state of mental tranquility and well-being; neither depressed nor manic." *Dorland's Illustrated Medical Dictionary* 655 (32d ed. 2012).

2009, similarly reports the patient is doing well, with no side effects from medications.  T. 300.  The mental status exam was normal in every regard.  T. 300.

Ms. Sanders underwent one consultative psychological evaluation.  T. 259-62. This occurred on October 25, 2007, when Marie Hume Guilford, Ph.D., a licensed clinical psychologist, performed an evaluation at the request of the state agency.  T. 259-62.  Plaintiff was entirely cooperative with the interview and appeared to be a reliable and sensible informant.  T. 259.  She reported that she took Abilify and Cymbalta for depression.  She had been taking her medication for over a year and it helped her "cope."  She lived independently and performed "a lot" of housework, as well as prepared meals and went grocery shopping.  T. 260.

Dr. Guilford indicated that plaintiff appeared to have limitations in her ability to tolerate the stress of work.  She concluded that plaintiff's problems did not significantly impair her ability to follow simple, one or two-step instructions, but at times they affected her ability to interact with others.  Plaintiff was sometimes able to maintain attention and concentration; her pace was slow for most work settings; and she could not tolerate the stress of a routine workday and adapt to change.  T. 261.

The mental status exam showed a cooperative and friendly attitude.  Ms. Sanders was alert and fully oriented.  Her mood appeared depressed with minimal anxiety.  She had good communication and social skills.  She reported a concern about her medical bills.  Her thoughts were organized and goal-oriented.  She had no abnormal thought content.  The doctor thought claimant to be functioning in the borderline to low average range of intelligence, with an inadequate fund of information.  She had limited judgment and insight.  T. 261.

Dr. Guilford construed the Apalachee Center chart as indicating that claimant is fairly stable as long as she takes her medication.  T. 261.  She noted a provisional diagnosis of schizoaffective disorder and rule out mild mental retardation.  T. 262. The prognosis was poor.  T. 262.

In January 2008, Jane Cormier, Ph.D., a state agency consultant, reviewed the medical and other evidence in the file, including the evaluation by Dr. Guilford, and concluded that plaintiff appeared capable of independent living.  She found no evidence of mild mental retardation in the record.  T. 276.  Dr. Cormier completed a Mental Residual Functional Capacity Assessment in which she indicated that plaintiff was not significantly limited in areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation; except for a moderate limitation in her ability to maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruption.  T. 278-80.  Plaintiff appeared capable of adequate adaption and of routine, as well as repetitive tasks on a sustained basis.  T. 280.

Dr. Cormier also completed a Psychiatric Review Technique in which she reviewed all current records including the 1996 note mentioned above, and a 1990 entry.  T. 264-76.  Cormier noted that the 1990 and 1996 notes do not document psychosis.  T. 276.  She also reviewed the records of Apalachee Center, summarized above.  According to Dr. Cormier, the psychotic symptoms appear to be "by history." T. 276.  The actual chart from 2007 does not evidence psychotic symptoms.  T. 276. Dr. Cormier seems to have detected some inconsistency in Dr. Guilford's charting of borderline to low average intellectual ability, when compared to Guilford's diagnosis of rule out mental retardation.  T. 276.  According to Dr. Cormier, claimant

"has been able to fill out forms in adequate detail, she appears capable of independent living and there is no evidence of mild MR in the record." T. 276. Dr. Cormier conceded a severe mental impairment for Social Security purposes.[9] The ALJ, of course, found that claimant had the severe impairments of bipolar disorder and schizoaffective disorder. T. 12.

J. Patrick Peterson, Ph.D., also completed a Mental Residual Functional Capacity Assessment, dated March 24, 2008. T. 296-99. The summary conclusions largely coincided with those reported by Dr. Cormier. Dr. Peterson's review of the chart, including entries up to five months earlier, led him to conclude that the "findings are contraindicative of presence of any diagnosable mental [disorder] beyond mild/moderate Adjustment Reaction arising [within] a rather labile/unstable/cyclothymic & mildly Borderline/schizotypal individual." T. 298. In particular, Dr. Peterson found evidence in the medical record that claimant resides alone, and independently. She functions at least minimally in a full range of activities of daily living. He also noted that the recent therapeutic services offered to claimant, are "confined to a supportive, palliative role . . . ." T. 298.

---

[9] As applied, the step two severity determination is a threshold inquiry used to screen out "trivial" claims, meaning an impairment is not severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984); *see also Bowen v. Yuckert*, 482 U.S. 137, 145 n.5 (1987); *Stratton v. Bowen*, 827 F.2d 1447, 1453 (11th Cir. 1987); *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). As construed by the Eleventh Circuit, "[a]n impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience. Claimant need show only that her impairment is not so slight and its effect is not so minimal." *McDaniel*, 800 F.2d at 1031.

Claimant, herself, noted in an Adult Function Report that she lives alone. She tries to take care of her bills and of the house. T. 157. In the narrative portion of the same report, claimant wrote she needs medication each day, and needs assistance to get it, because it is expensive. T. 164. In a Disability Report completed at the agency review level, claimant went on about her financial state: "[m]y financial situation [is] very bad [and] have way too many Dr. bills to pay that I can never pay they are up to $9000.00 . . . I can't afford the blood test that the medications require . . . ." T. 177.

Claimant testified at the ALJ hearing, which took place on December 31, 2009. T. 24-34. On direct examination by her lawyer, she said she completed eleventh grade in Wakulla County. She did "okay" for a while, but had trouble with math and history. T. 25. She has trouble reading, but can read part of the newspaper. She believes she can't work because she has stress and anxiety attacks when she tried that. T. 26-27. Anxiety is also brought on by worrying, mostly at night. She had such an attack a week before the hearing. T. 28. Claimant indicated she gets treatment for this.[10] In response to a question as to whether her medications are working, Ms. Sanders said they have now been changed, because after a while they don't work. T.

---

[10] According to the transcript, and plaintiff's brief, she goes to "Appalachian Center in Coffeyville." T. 28. The record does not reflect any such treatment, nor does it identify this facility. Plaintiff said they have diagnosed "bipolar and a little schizophrenia" raising a question that the reference may actually be to the Apalachee Center in Tallahassee. A brief internet search does not reveal a "Coffeyville" in North Florida, but does suggest that such communities exist in Oklahoma and Kansas. *See* http://www.wunderground.com/weather-forecast/US/KS/Coffeyville.html; http://www.wunderground.com/weather-forecast/US/OK/South_Coffeyville.html. Ms. Sanders lives in Sopchoppy, Wakulla County, Florida. T. 172. Also, when the ALJ asked questions, he referred to the "Appalachia" Center, and correctly referenced the dates of treatment at Apalachee. T. 34. The reference is more than likely to the Apalachee Center, where claimant has received the bulk of her diagnosis and treatment.

29. In other parts of her direct examination, claimant referred repeatedly to anxiety attacks, in the context of her inability to work. T. 30-31, 33.

The ALJ asked a few questions. He pointed out that the mental health records don't mention anxiety attacks or "anxiety problems in general." T. 34. Plaintiff said "um-hmm" when asked if she had told her doctor about these matters. T. 34. The ALJ observed that the records seem to be saying claimant is doing well with no side effects and asked whether that would be true for the last two years. T. 34. Ms. Sanders answered in a nonresponsive manner, "I just tell her about it, and after you take medication for a long time you have to change it." T. 34.

Mr. Paul Dolan testified as a vocational expert. The ALJ formulated a hypothetical question taking into account a number of limitations. The expert was to assume an individual with claimant's age and background. The individual would be limited to low stress work that could be done primarily alone. Interaction with others would be brief and superficial. Such a person would be limited to work of slow or moderate pace. Finally, such a person would have a moderate limitation of concentration. T. 36. Mr. Dolan identified a number of jobs within these limitations. T. 37. Plaintiff's counsel did not cross examine. T. 38.

## ISSUES ON REVIEW

On review of the decision, plaintiff argues that substantial evidence does not support the ALJ's decision because 1) the ALJ failed to address plaintiff's school records received after the hearing, and 2) the ALJ failed to properly address the severity of plaintiff's mental condition and her GAF scores. (Doc. 13, p. 2). Based upon these assertions, plaintiff argues that the ALJ erred by concluding that plaintiff has not been under a disability for at least twelve consecutive months.

ANALYSIS

Plaintiff first argues the ALJ erred by failing to utilize plaintiff's school records, obtained after the hearing. The record reflects that these records, Exhibit 16E, T. 184-98, were placed in the record in January of 2010. These records are not referenced in the ALJ decision, although they are identified in the list of exhibits appended to the decision. T. 21. They were, then, part of the file reviewed by the Appeals Council, which issued its denial March 10, 2012. T. 1-6. The Appeals Council considers the entire record, including the new material, and chronologically relevant evidence, and will review the ALJ's decision if the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970(b). The role of this court is to "review whether the new evidence renders the denial of benefits erroneous." *Ingram*, 496 F.3d at 1262.[11]

In the brief, plaintiff repeatedly focuses upon a statement made by the ALJ at the conclusion of her testimony. Referring to the school records, the ALJ said, "there certainly is a reason to get them." T. 37.

Plaintiff's argument concerning the school records fails for two reasons. First, the record does not support an inference of mental retardation, of which, plaintiff infers, these records are critically probative. Second, and related, the records do not aid the plaintiff's cause. In formulating residual functional capacity, the ALJ took into account Dr. Guildford's opinion that claimant likely functions in the borderline

---

[11] The Appeals Council order does not reference Exhibit 16E in its listing of submitted evidence. The order does, however, list Exhibit 17E, an item later submitted, pending the Appeals Council review. The records in question were submitted about a month before the ALJ decision, and, without a showing, or even allegation, to the contrary, were part of the record reviewed by the Appeals Council. Pursuant to my duty of independent review, I have carefully considered these records.

to low average range of intelligence. T. 13. Dr. Cormier, reviewing a fairly complete chart on mental health treatment, found support for her conclusion that claimant could understand and complete simple tasks. Scouring the entire record, Dr. Cormier, nor any other provider, offered any evidence at all of mental retardation. Claimant herself, talked repeatedly about anxiety, not mentioning at all any intellectual limitations that would affect her ability to work. Also inconsistent with a suggestion of severely limited intellectual functioning, plaintiff said she takes care of her bills, can handle a savings account, and use a checkbook or money order. T. 131, 134, 157, 160. She also cared for her severely disabled child for years before his tragic death. Simply put, the record, even viewed in a light most favorable to plaintiff, does not suggest a threshold of mental retardation.

But wait, plaintiff might say, that's exactly why I wanted the records. Assuming this is the argument, plaintiff did in fact get the records in evidence before the ALJ's decision issued. A simple review of the school records themselves reveals why neither the ALJ nor the Appeals Council devoted attention to them. In ninth grade, claimant got primarily A's, B's, and C's, with three semester grades of D. In tenth grade she had five D's, but six semester grades of A, B, or C. T. 188. She got an A in reading! She appears to have not actually completed eleventh grade, despite her testimony, based upon the number of incomplete grades, and absences, for the second semester. T. 188. The records tell more than grades, however. On an IQ test, plaintiff scored 95. T. 190. Nothing indicates that such a score is close to the level of mental retardation. Also plaintiff's record of standardized testing done when she was seven years old shows she scored an 83 on the reading test. She got poor evaluations, however, in "reading interests." T. 190. Plaintiff is unhappy that the

school records are not referenced by the ALJ, but does not explain how they could have made a difference, given the extensive mental health chart, the plaintiff's own testimony, and the actual jobs identified by Dolan. *See Caldwell v. Barnhart*, 261 F. App'x 188, 191 (11th Cir. 2008) (observing that ALJ's failure to assign weight to medical opinion that did not otherwise contradict ALJ's findings was harmless error); *see also Skarbek v. Barnhart*, 105 F. App'x 836, 840 (7th Cir. 2004) ("An ALJ is required to consider impairments a claimant says he has, or about which the ALJ receives evidence. 20 C.F.R. § 404.1512(a). Although Skarbek did not specifically claim obesity as an impairment (either in his disability application or at his hearing), the references to his weight in his medical records were likely sufficient to alert the ALJ to the impairment. *See Clifford [v. Apfel]*, 227 F.3d at 873 (holding that ALJ should have been alerted by 'numerous references in the record' to the claimant's weight problem). Despite this, any remand for explicit consideration of Skarbek's obesity would not affect the outcome of this case."). These school records could not have had any appreciable effect upon the vocational hypothetical question posed by the ALJ, nor upon the residual functional capacity underlying the hypothetical question. No reversible error has been shown.

Similarly, plaintiff cannot prevail on her claim that the ALJ failed to properly address the severity of her mental conditions. The assumption, given the ALJ's findings, is that claimant did indeed suffer from severe mental impairments, which did not rise to the level of listed impairments. Beginning at page 12 of her brief, plaintiff recounts portions of her treatment at Apalachee Center. Tellingly, she focuses her argument entirely upon the records of 2005 and 2006, a period when she had the external factor of her son's death, was an admitted user of illegal substances,

and was noncompliant with her medication. T. 203-04, 222, 251. To be sure, the post-2006 records are not all rosy, but they consistently militate in favor of the limitations and residual functional capacity adopted by the ALJ.

When there is evidence of a mental impairment that allegedly prevents a claimant from working, the Commissioner must follow the procedure for evaluating mental impairments set forth in the regulations. *See* 20 CFR § 416.920a. Here, however, plaintiff does not question the ALJ's fidelity to the regulation, a rule requiring use of a "special technique," memorialized as the Psychiatric Review Technique Form. *See Morrow v. Apfel*, No. Civ.A.CV98-0566-RV-G, 2000 WL 284210, at *3 (S. D. Ala. Feb. 23, 2000). In fact, the ALJ had the Psychiatric Review Techniques performed by both Dr. Cormier and Dr. Peterson. T. 264-76; T. 282-95. Instead, plaintiff discusses excerpts from the 2005 and 2006 treatment at Apalachee Center. (Doc. 13, pp. 12-13). Plaintiff goes on to admit that "subsequent admissions revealed that with the right combinations of medications . . . seemed [sic] to help her symptoms . . . ." (Doc. 13, p. 13). This might be an understatement. As detailed above, the chart from February 2007 through November 2009 (weeks before the hearing) shows plaintiff was doing well, had normal mental status findings, and was without medication side effects. Yes, some of the observations in 2005 and 2006 reflected unusual, and even dramatic complaints, but these had resolved over the next three years. Plaintiff does not explain how the ALJ might have erred by his examination of the medical opinions of record. *See* 20 CFR § 416.927 (offering the controlling rules with regard to evaluating opinion evidence).

The Commissioner argues that medical source opinions support the residual functional capacity in this case, that being a limited range of unskilled work. (Doc.

14, pp. 12-13). The record bears this out. Dr. Guilford concluded that plaintiff would be able to follow simple, one or two-step instructions, T. 261, consistent with the ALJ's finding that she could perform unskilled work. T. 15. *See* 20 C.F.R. § 416.968(a) (defining unskilled work, generally, as work that requires little or no judgment to do simple tasks that can be learned on the job, in a short period of time). The ALJ properly relied on Dr. Guilford's opinion, as she was an examining psychologist and her opinion was supported by objective medical findings and consistent with the record as a whole. *See* 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Dr. Guilford also concluded that, at times, plaintiff's problems affected her ability to interact with others, her pace was slow, and she could not tolerate stress. T. 261. The ALJ accounted for these limitations in his residual functional capacity determination. T. 13 ("She needs low stress work that is done primarily alone. However, other individuals can be in close physical proximity, but interaction can be no more than brief and superficial. She needs slow to moderate pace work. She has moderate limitations in regard to concentration."). Dr. Cormier concluded that Plaintiff appeared capable of understanding and completing simple and detailed tasks, maintaining attention for simple tasks, interacting appropriately with the public, coworkers, and supervisors, adjusting to changes in a routine work setting, and performing routine, repetitive tasks. T. 276-80. This coincides with the ALJ's residual functional capacity determination for a limited range of unskilled work.

The ALJ also considered claimant's daily activities, the significant gap in treatment before 2005, and claimant's inconsistent claims of disability. T. 16. In

particular, claimant could not bring herself to acknowledge the general effectiveness of her medications. T. 16. Claimant's description of symptoms and limitations, consisting in part of her claims of "anxiety attacks," was, said the ALJ, "generally . . . inconsistent and unpersuasive." T. 16. Also, portions of the record summarized above suggest that claimant, in her quest for benefits, was largely motivated by her desire to cure a difficult financial situation. T. 164, 177.

None of the evidence relied upon by plaintiff on this point identifies medically imposed functional limitations that would affect her ability to work. The ALJ reasonably found that claimant retained the functional capacity for unskilled work, accounting for stress, interactions with others, and diminished pace and concentration. T. 13.[12] "[R]esidual functional capacity is the most [claimant] can still do despite [claimant's] limitations." 20 C.F.R. § 416.945(a)(1). The residual functional capacity here is supported by substantial evidence.

The Commissioner has committed no error in application of the controlling law. Similarly, the findings of the ALJ are supported by substantial evidence.

ACCORDINGLY, it is ORDERED:

---

[12] Plaintiff mentions some GAF scores in her statement of the issue, but does not amplify on this in her argument. Perhaps this is because the low scores she mentions were from the 2006 time period. The most recent GAF was 80, reported in January 2009. T. 306. This score is significantly higher than a GAF suggesting vocational difficulty. A GAF score between forty-one and fifty indicates severe impairments. *See McCloud v. Barnhart*, 166 F. App'x 410, 418 (11th Cir. 2006). A score between fifty-one and sixty indicates moderate difficulties or symptoms in social, occupational, or school functioning. *See Wind v. Barnhart*, 133 F. App'x 684, 687 n.1 (11th Cir. 2005) (*citing* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000)). The same edition of the *Diagnostic and Statistical Manual (DSM-IV)* indicates that a GAF score of 71-80 reflects transient symptoms, and no more than slight impairment in social, occupational, or school functioning. *DSM-IV* at 32.

1.  The decision of the defendant Commissioner is AFFIRMED and plaintiff's application for Supplemental Security Income is DENIED.

2.  The clerk is directed to close the file.

At Pensacola, Florida, this 19th day of February, 2013.


/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**